General Land Office of the State of Texas v. Biden, and we'll hear from Mr. Talon. Good morning, your honors. May it please the court. I'm Michael Talon, representing the states of Missouri and Texas in this appeal. This appeal is about the Biden administration's decision in 2021 that building physical barriers on the southwest border is, quote, not a serious policy solution. And so the proclamation that declared that new policy ordered the Department of Homeland Security to pause work on strict construction projects currently in progress building those physical barriers and divert that money elsewhere. The problem is that in the fiscal year 2020 and 2021 Consolidated Appropriations Act, Congress mandated that the appropriated, their roughly $2.7 billion, be used for the construction of physical barriers. That is, Congress passed those funds to fund the construction of physical walls that the Trump administration was doing at that time, consistent with that administration's policy that walls work in preventing illegal cross-border activity. So the Biden administration's decision is unlawful. Diversion of that money is unlawful. And because it's an unexplained reversal from the Trump administration's policy, it's arbitrary and capricious. The district court, however, didn't reach the merits of that decision. It instead dismissed the state of Missouri for lack of standing and Texas for improperly splitting its claims with the general land office and department and executive department of the state that brought suit earlier on. I'll address claim splitting first because implicit in the district court's reaching of that decision is that the most analogous precedent is the Remain in Mexico decision from last year, Texas v. Biden. It's also consistent with the enforcement priorities decision. The district court's implicit holding that Texas has standing is also consistent with its decision that the general land office, and the case consolidated with this one, has standing because a general land office, as manager of a farm in Starr County, Texas, is seeing an influx of illegal immigration through the farm, through a gap in the border wall into the state of Texas. Well, of course, we can't impute standing of the general land office to the state of Texas at this point, right? That's correct, Judge Jones, but the logic is the theory for standing in the general land office for the general land office is what the state of Texas relies on here. That is, the border wall is increasing illegal migration into the state, those aliens enter into the state, and then they use the state's resources. And so that's a kind of driver's license injury, the social cost of social service injuries, that this court has discussed time and again. The claim splitting doctrine adjacent to the doctrine of res judicata, though serving a different purpose, docket management in the district court, relies on the same elements of claim preclusion. So same case in controversy, parties be the same. This case is really about that second half, the privity analysis. It requires adequate representation. That's what the district court relied on. That's what the parties dispute here. Adequate representation has a factual element and has a legal element. The factual element is not met here because, as I discussed earlier, the general land office, in its operative amended complaint, is suing because as a manager of a farm in Starr County, Texas, its interest in seeing the border wall completed is really its interest in seeing the gap closed in that covers its farm. It's a small portion of the border. Texas's interest is in the border writ large, is in the general policy writ large, is in the effect of illegal immigration on the state itself. So the state of Texas factually is suing over a much broader kind of policy concept in the general land office. I'm just wondering, did anybody from the Texas Solicitor General's office come to New Orleans? Not for this argument, no. Well, it seems to me this is a heavily Texas-infused question about privity and representation. I think that's just sort of interesting. Well, I think they're willing to outsource this because I think it's clear on a legal authority front that the general land office doesn't have authority to represent the state of Texas. This court's holding in Sierra Club v. City of San Antonio noted that only the attorney general has the authority to bring suit in the name of the state for the state qua state. And so this is on the legal side, and this is kind of pulling from what the government's own case, Sunshine Anthracite, whether the general land office has authority to represent the state of Texas, whether there's that legal relationship between the two. And there's clearly not. No one has pointed to authority that lets a general land office represent the state in court. And so from a factual standpoint, I'll point out the district court said there's no definitive proof that the general land office is representing the state of Texas. So on the factual side, there's an absence of alignment of interest, that first part of that Taylor v. Sturgill test. And then on the legal side, there's no evidence, there's no legal authority. Factually, there's no alignment of interest. And it's the same wall, isn't it? But this court in, I believe, Freeman noted that parallel interests do not establish that close alignment of interests. It has to be something. So they may have a parallel interest in seeing the border wall completed in that across a farm in Starr County, but the GLO's interest does not extend to the border writ large. And in fact, that was a district court standing analysis for the general land office. It's on that narrow strip of land. And I think that, you know, going on to like kind of principles of race, where's the wall supposed to be built on that narrow strip of land or that's what the GLO brings its suit about a gap in the wall in Starr County, state of Texas brings its suit about the policy of the Biden administration, not to construct construct physical 700 mile border, to be blunt. Yes, Judge Jones, the 700 mile border, the Trump administration's goal in its 2020 press release in the record cited that its goal was to build 450 miles of wall, for example. We're talking, it's a difference of magnitude of hundreds and hundreds and hundreds of miles, Judge Graves. And so there's, it may be parallel, at least in Starr County, but it's not factually aligned. These are at best a parallel interest, which does not establish the legal relationship necessary to establish privity. And so it doesn't establish, and so doesn't support the district court's claim splitting holding. And on the legal authority front, I'll just point out again, even if they were suing over the same interests, what matters is also whether there's a legal relationship between the two, whether there's authority on the GLO for the GLO to represent the state of Texas, something akin to a class vis-a-vis the class representative, a class representative to the class as a whole, or something akin to a fiduciary duty brought by the party in the first suit. So reversing on the claim splitting issue, then I think establishes standing under this court's precedence. I mentioned the Remain in Mexico case. I mentioned the enforcement priorities case. Those cases all are factually and analytically similar to this one. They all rely on a government policy that will result in more illegal migration into the states, whether Texas or Missouri, and then those migrants in the states using the state resources, either trying to get driver's license, because as this court noted, in the DACA case, driving's a practical necessity, using state health care resources, or using the public education system. These harms are all well-established in the record. On the premise that walls prevent illegal migration, the states rely on the Department of Homeland Security's own analysis. The states looked at that and put into the record the fiscal, the 2018 and 2020 press releases from the Department of Homeland Security declaring that walls work, that they prevent illegal immigration, not just in areas where they're constructed, but across a broader, there's a force multiplier to it. Of course, the Department of Justice will say, I believe, that you haven't pled sufficient facts as to Missouri to show any impact, or at least any substantial impact. These are pocketbook harms, so any amount of money, a small amount of money would constitute a sufficient injury. The state of Missouri put into the record, and everyone's, I think, premising this on the preliminary injunction record the states filed with the district court. In that record itself, it shows that the state of Missouri has an illegal immigration population, which is consistent with this court's, I think, kind of common sense conclusion that people do not stay in one place. They cross the border and then move throughout the country. From a kind of judicially noticeable standpoint, the Department of Homeland Security, when it terminated the Migrant Protection Protocol, noted that fact. They conceded that illegal aliens, illegal immigrants, were all border states from that record. But Missouri didn't plead a single fact about there has to be traceability, too. There's certainly a serious problem of the illegal immigration, but there has to be traceability, both from the claim that is being made. Of course, it doesn't matter if Texas can sue and has standing, right? That's right, Judge Jones. I think my first answer to that would be whatever we discuss about Missouri, Texas clearly has standing here. The state of Missouri has shown that illegal immigrants, illegal migration, results in that they come to the state. No, it is alleged that, but there are no facts. So were the case to go farther, Missouri would have to introduce some evidence, wouldn't it? That's right, Judge Jones. And in this posture, we would have to prove it up, I think, more thoroughly if we ever went to trial. What I don't understand about the posture of this case is, based on the trial court's theory that essentially the land office and the state of Texas are seeking the same relief, which I think is pretty plain, I don't understand why she just didn't say, I'm going to take these cases and try them together. But why didn't the states move for that kind of consolidation? So we were responding to a motion to dismiss on claim splitting. We didn't make that argument in the alternative. Well, the case has been pending for several months before that occurred, right? And the states have been trying to expedite their preliminary injunction motion multiple times and get it heard, and it's moved on parallel tracks with the motion to dismiss. Judge Alvarez simply consolidated the two cases and then dismissed out. One of the things she could have done and probably what I think would have been— The whole theory of claim splitting seems illegitimate to me if you have a 42A consolidation. I mean, it just seems logically nuts, a non sequitur to say two cases are consolidated, but I can dismiss one because I can dismiss it. And I think that a proper reversal and remand, the states and the general land office and the federal government could sit down and work out a way to hear everything together on an expedited schedule. Well, the general land office could have come in here and spoken for itself too, and that absence is sort of mysterious to me. Well, the judge just consolidated the two cases and then heard the motion. I really don't care. I mean, we looked up whether there is apparently a separate case management deal for the general land office right now, and it just . . . again, it's a total mystery to me why the GLO and the state attorney general couldn't get together on this. Well, I mean, I think if we go back down, I think given maybe the kind of odd postures that they came into with separate—there was a preliminary injunction motion pending in front of Judge Tipton that came into—that came with Judge Alvarez that the states were trying to get heard. I think there's just trying to parallel track them through at the same time, and then given the stay that the district court handed down and then the separate appeal by the states on that stay. If we were to get into the merits, I don't understand the difference between the states claim that they are not seeking to reinstitute the border wall as such. They are seeking to vindicate the turnabout in policy and the unlawful—remedy the unlawful action of the government in not following the law. I don't understand the—what is the practical difference between those positions? So the—so building off of—so start—the baseline kind of legal, I think, remedy that then builds into the practical remedy you asked about, Judge Jones. The legal remedy is that the federal government has engaged in unlawful and arbitrary agency action. So that under the APA, the result would be vacatur of that remedy, which would put back in place the Trump administration's prior plan. The rescission of that plan would be ended, and then the Department of Homeland Security would have to reinstate and follow the prior administration's plan. Right now, what the administration has been arguing in this court and in the district court is that it's essentially a pretext argument. Their argument is, well, we don't have to follow that plan because everything we're doing—the remediation, the preparatory steps going to the initial plan, the installation of barrier system attributes—is consistent with the statutory authority. And so we're well within the agency's arguments. We're well within our discretion to continue what we've been doing, which is doing everything but border barrier construction. Vacating that kind of directive down from the Department of Homeland Security would require it to go back to the Trump administration plan and actually start working towards barrier construction, which is what the preliminary injunction, what the state's remedy is to look to, and is also consistent with what Congress mandated with the Appropriations Act. And I see I might—I will reserve the rest of my time unless the panel is— Time for rebuttal. Mr. Sheehy. Thank you, Your Honor, and may it please the Court. Mike Sheehy for the federal government. I want to start by addressing a key assumption underlying the state's arguments both at the threshold and on the merits. The states imply that under DHS's spending plan, the agency really isn't doing anything meaningful at the border at all, and I want to make very clear that that's not the case. Under the plan, DHS is constructing force multipliers to make existing barriers work better. They're building cameras and lighting systems— You know what? That is so absurd. The facts on the ground—at least three million people have surged through the border in the last year and three quarters with no end in sight, and in fact, an additional surge imminent because of the—is it to remain in Mexico that's about to end? So I don't care what force multipliers. They haven't stopped fentanyl. They haven't stopped illegals. So, Your Honor— So why do you argue with a straight face that alternatives to a barrier have been implemented that fulfill the directives of Congress in 19—2020? So there are two responses to that, Your Honor. The first is just as a common-sense point. There are more barriers on the nation's southwest border now than at any point in recent history. That's my understanding. Yet my understanding is, as Your Honor has pointed out, there has been more migration, notwithstanding the fact that there are more barriers. And that just indicates, as the D.C. Circuit said in the Arpaio case, that the decision whether to come across the border made by any given migrant is determined by more than the existence of a barrier wall. So what explains the fact that there was something like only 9,000 a month—I may be slightly off on the statistic—at the end of the last administration? So, Your Honor— Did all of a sudden Honduras, Guatemala, Nicaragua explode with uncertainty? Did all of a sudden communism in Venezuela get so bad that half of Venezuela is migrating to the U.S.? To say nothing of Brazil and all these countries in Africa and the Middle East and so on again. You know, this argument has—it's absurd. It is factually absurd. We disagree that it's absurd, Your Honor. And the reason we disagree is because—and the reason we're here making the argument is because, as many courts have acknowledged, including the D.C. Circuit in the Arpaio case, any one policy doesn't determine whether somebody chooses to come across the border. That decision turns on, among other things, the state of play in those countries, as Your Honor pointed out. It turns on whether the border is enforced or not. It turns on whether the immigration policy has any teeth. And obviously, the implication throughout the world is that the United States no longer has borders. Your Honor, that is quite a different argument than the issue in this case. The issue in this case isn't a general challenge to every single one of the Biden administration's immigration policies. The challenge in this case, as opposing counsel made quite clear at the end of his presentation, is whether the states can compel the federal government to build border barriers in particular locations. Well— And as— Go ahead. And as to that, Your Honor, in order to demonstrate their entitlement to that relief, both as a matter of Article III standing and as a matter of the merits, they need to show that compelling construction in those locations would actually reduce migration. And that is something they absolutely haven't done. Well, they can allege whatever they want to allege. And for purposes of dismissal, we take their—I don't see why their allegations of standing are any different than the allegations of standing in the DACA and DAPA cases. And the fact that the Supreme Court heard one of those on the merits, it seems to me, suggests that the allegations about traffic licenses, increased costs of education, and health care are perfectly legitimate. So two things, Your Honor. First, even if those cases were on point, they would only apply to Texas. And so that doesn't apply to Missouri. But that's sufficient. It is, Your Honor. And so even with respect to Texas, so the cases' factual patterns are just quite different. So in DAPA, my understanding is that case had to do with policies affecting benefits to non-citizens who were already in the United States. And my understanding of the priorities cases, it had to do with general enforcement decisions made at the border. But this plan is quite different. The point of this plan, as the plan itself explains, it doesn't modify eligibility for public benefits. It doesn't affect benefits granted to people here in the United States. The point of the plan is to make existing barriers work better. And no one is disputing. And this is a point on the merits that I want to make very clear. Nobody is disputing that the administration has lawful authority to spend money on critical force multipliers. But it only has authority to spend money consistent with the statutory authorization. So there we get to the legal question here. Yeah. So I'm glad for the opportunity to talk about that statutory authorization. The text of the statute does not say what my friend on the other side says. He came up and he said that it compels the construction of a border wall. That's not what the statute says. The statute says, quote, we appropriate funds for the construction of barrier system. And that's a very different thing. Because the word system, the plain meaning of that is exceptionally broad. As our brief explains, it refers to, quote, a regularly interacting or independent group of items forming a unified whole, such as a group of artificial objects forming a network especially for serving a common purpose. And so if you read pages 22 through 24 of the state's reply brief, and I really encourage the court to do so, you'll see that they concede that this language encompasses what DHS is doing with the money. They concede that, quote, the FY 2020 and FY 2021 appropriations may go to barrier-related items. Their only claim is that the statute includes some restriction that doesn't appear in the text. Namely, construction of barrier system on the nation's southwest border, the majority of which, or some indeterminate percentage of which they haven't said, must be construction of new physical barrier. And that requirement appears nowhere in the statutory text. I think their argument is a little more nuanced than that. In addition to the fact that they focus on the word construction, they also focus on the fact that the previous administration sought this funding and then clearly believed that it applied to the construction of a barrier wall. That's not accurate. And then the present administration, without explanation, without complying with the APA, uh, uh, uh, turned about and said, no, it doesn't. So the first thing— That therefore violated the APA. So on, on what the prior administration thought it was doing with this language that it requested, you don't need to take my word for it, Your Honor. Just look at one of the press releases from the prior administration that forms the basis of the other side's case. This is on page 1536 of the Record on Appeal. It says, quote, border wall system includes, and then it lists a whole bunch of bullet points. And one bullet is, of course, physical barriers, but another bullet talks about precisely the sort of vital infrastructure that the administration now is spending money on. So even in the prior administration, there was an understanding that the border wall system phrase included not only the physical barriers themselves, but also the infrastructure that is necessary to make those barriers actually function. But as to the, uh— Of course, go ahead. The second part of your question, Your Honor, had to do with this administration's explanation or lack thereof, right? And I want to direct the Court to the presidential proclamation because I think that the other side has, again, not accurately characterized that content. Look, there's no dispute that this administration has made the policy decision that a border wall generally, uh, is not an effective way to stem, uh, migration across the border. But if you look at the proclamation, the president expressly recognized that certain appropriation statutes do continue to bind the administration. That's why the proclamation orders DHS to develop a spending plan that provides, quote, for the expenditure of any funds that the Congress expressly appropriated for wall construction consistent with their appropriated purpose. That's at 86 Fed Reg, uh, 7226. And the proclamation then emphasizes, again, as if it weren't clear enough, same page, that the plan must be, quote, appropriate and consistent with applicable law. And indeed, uh, as even— The first thing, so the first thing, I'm, I'm not sure how this fits in. You can tell me, but the first thing the administration did when it got into office was cancel contracts that were underway for construction where there was already steel on the ground in place ready to go in, canceled the contracts which has led those companies to file huge, uh, court of claims, claims for breach of contract by the U.S. You're saying that fulfills the purposes of the, uh, does paying those damages, uh, properly implement the statute? I'm, I'm not familiar with those cases, Your Honor. Um, they, they haven't come up in briefing. Well, I know you're not dealing directly with those cases, but the point is that the government, the present administration chose not to breach those contracts and therefore not pursue the policy of the previous administration, and therefore they are misusing funds that were otherwise supposed to go to strengthening the border. We disagree with that characterization, Your Honor. I'm sure you do. Let me try to explain why. No one disputes that the statute vests discretion in the administration and in DHS to decide which border barrier projects to construct. Now, imagine a world where we have decided, uh, as was the case, to allocate some funds to the Laredo project, and then, uh, the same administration decides, oh, you know, that was a bad idea. It turns out that, you know, belatedly we found out that folks aren't coming across as much as Laredo as, you know, maybe some other place. But we've only got a limited pool of funds that Congress has appropriated, so we're going to spend that money not on Laredo, as we have contracted to do, but on another part of the border. No one disputes that the statute does not stop the administration from doing that, and, you know, presumably if the administration does that, it would still have to incur the same sort of cancellation costs that Your Honor was referring to. Well, in fact, that doesn't normally happen, but go on. Well, Your Honor, the point is that the appropriations statute is enacted against the backdrop of Section 102 of IHRA-IHRA. That statute makes quite clear that the ultimate determination for an administration as to where a particular project ought to go is vested in the ultimate discretion of the Secretary. It doesn't say, once you start a project, you have to continue building that project even if facts on the ground change, and the facts on the ground here in the judgment of the agency have changed. So, and to be clear . . . Where are you going? Okay, well, go on. I want to just . . . Texas is half of the border with Mexico, is it not? I don't know the exact . . . Yes, I believe it is. I said . . . It's a big portion. No, it's at least half from a mileage standpoint, and therefore, you know, the facts on the ground, I just don't understand this. Whatever the administration says it is, quote, doing, is totally ineffectual, and therefore, not carrying out the purposes of the appropriation. There is no proof of that in the record, and the burden of that is on the other side. Well, I think the court can take judicial notice of how many of the tens of thousands of people that are lining up at every entry point along the Texas border. El Paso, Del Rio, Laredo, Eagle Pass. But that is conflating causation and correlation, Your Honor, because as I pointed out earlier . . . Well, sometimes correlation is highly associated with causation. Sometimes, Your Honor, but the point is it's their burden to demonstrate that it is. Let's look at the actual evidence that they've cited. Let's look at any evidence. Do you have any evidence that your countermeasures have had any effect on something? So, we are still building out the countermeasures right now. But the other thing . . . A year and nine months into the administration. So, I don't know those numbers off the top of my head. But what I can tell Your Honor is this. First, as I pointed out earlier, the other side's simplistic association of total number of miles and total reduction in migrants just doesn't fit with, you know, just observations, because there are more border walls now than there were at any point in recent history. And yet, the numbers are high. So, they need to show something more than that. And then, let's look at the evidence that they've put forward, because as the Supreme Court has made clear, it's not the burden of the defendant to negate standing. It's the burden of plaintiffs to prove it. You're correct about that. We're here on a motion to dismiss, right? So, maybe I'm stepping ahead of myself. But yes, you're right. They have the burden to prove their standing. So, you know . . . But again, I mean, that's been accepted in all these other cases. But those cases was . . . And the only distinction you draw is that somehow the people who came illegally there were remaining. A couple of things, Your Honor. So, again, just look at the . . . Every illegal minor has a right to be educated in the state of Texas. Every illegal who comes over with a health problem has a right to secure medical care. And in fact, that is imposing a huge burden on counties and towns all over the state, probably all over the United States. But you see what I'm saying? I do, Your Honor. And standing isn't assessed at that level of generality. It's not enough to say they're challenging the general administration's view on immigration and therefore they have standing. That's not how standing works. They need to show that the particular action that they say is unlawful . . . That's right. And that action is not building . . . not implementing the statute in such a way that it creates a functional barrier. But no evidence suggests that a slightly longer barrier without all of these vital projects . . . . . . would not have been slight. Well, to begin with, the Laredo Project was only 70 miles, right? And so even under the prior administrations, my understanding is DHS only planned to use the 2020 and 2021 funds on construction of roughly 70 miles at the Laredo Project and, you know, some miles at the El Centro. It was not . . . this money was targeted towards 700 miles. At least that's not my understanding. But . . . In the record, if Your Honor were to take a look at what the prior appropriations were, we do cite the discussions in the brief. And I think there are declarations from, among others, Paul Enriquez at DHS that explain what DHS was originally going to do with the money. So I would direct the Court's attention there. But I think the key point is the other side rests on these press releases. But the press releases only show that where you put barriers down, crossings tend to decrease. But the press releases themselves acknowledge that that only works if the barriers are effective. And so it's not enough simply to have a wall on the border if, for example, there are no cameras or lights to tell agents that somebody is cutting through the barrier. If there are no roads to get to the border barrier system, then there's no way for agents to actually get there and figure out whether or not there is evidence of crossing. There's no dispute. But you said at the outset that people can't climb over these walls very easily, right? There's no dispute, Your Honor, that where there are barriers, that is an additional obstacle to crossing. But there's no evidence that merely the existence of a physical barrier without all of these other system infrastructures and force multipliers— I don't know. I have a physical barrier between my backyard and my neighbor's backyards, and we can pretty well see whether anybody's trying to cross over those. That's true, Your Honor. But your house, I would wager, is quite close to that barrier, and Border Patrol agents' patrol routes may not very well be close to the barriers, particularly because— You know what? You're talking to people here, at least two of us, who have been hearing illegal immigration and drug trafficking and alien smuggling cases for well over 30 years. We are quite familiar with the situation of the Texas border for that period of time, throughout much of which there was no barrier wall. We are also quite familiar with the access, with the techniques used by the Border Patrol, with the infrastructure, and so on. And your arguments, at least—one doesn't know what a record would show— carry very little weight in persuading me that all of your coherence of the argument— 20, 30-foot-tall wall and people can't climb over it, but no, you can't prove that it decreases immigration where it exists. So, Your Honor, I don't think I'm going to talk you out of that position then, but maybe then I could just turn to the merits. Even if the other side were able to establish their standing, which is what this goes to, they still need to surmount the claim-splitting obstacle. I'm happy to discuss that, Your Honor, but I want to focus on the actual merits of their injunctive request. They still need to show that under the injunction that they're requesting, something in the statute gives them a legal basis to enjoin the government, basically, to build the projects that they want where they want it. And again, their statutory analysis just doesn't come to grips with how broad the language is when Congress is appropriating funds not for specific projects and specific fencing. It's particular places, but instead for generally barrier system construction. And Congress knows, incidentally, as Your Honor is aware, given your experience with the legacy of wall construction, when Congress wants to specify, it knows how. For example, I think it previously—I see my time is expired. Can I finish this talk? It previously ordered, for example, an amendment to IHRA-IHRA saying, we want barriers extending from 10 miles west of the Tecate, California, Port of Entry to 10 miles east of the Tecate, California, Port of Entry. That's at, I think it's Public Law 109-367, Section 3. So Congress knows how to tell the executive we're appropriating money for a specific barrier at a specific place, and that's not what Congress has done here. Thank you very much, Your Honor. All right, sir. Okay, Mr. Tallent. Wasn't there a senator from Missouri named Tallent? Yes, Your Honor, he's— Relative? My father. I think it would help if you would respond first to what Mr. Shee had to say in the last minute or half or two minutes of his presentation as he focused on statutory authorization. You heard him, so you can just respond. Yes, happy to do so, and in addition, our reply brief, this systems argument that the government raises, they raised for the first time in this litigation, as far as I'm aware, and Mr. Shee talked about the fact Congress knows how to use particular language. It's also cardinal statutory interpretation that laws are read in context. He relies on language in Section A.1 of the 2020 Consolidated Appropriations Act. That language says that the funds appropriated shall be made available for the construction of barrier systems. Section B of the Fiscal Year 2020 Appropriations Act, and the 2021 Appropriations Act incorporates all this language, the purpose, and the amount of money. Section B references a type of design and specifically says steel bollard design. The obvious implication from that is Congress intended for the money to go to building physical barriers. You read statutory language in the statutory context as a whole. What do you mean they raised it for the first time? In the first, they've been arguing that all, so the argument that barriers, this argument as to systems is really about the installation of barrier system attributes, which is part of the 2022 amended border wall construction plan from the department. Prior to this, your point, Judge Jones, the money was going partly towards cost overruns and contract cancellations, environmental consultations, and remediation. In 2022, they've shifted and they're now using the money for environmental remediation and these barrier system attributes. The systems language that Mr. Sheeh seizes upon really only deals with that small portion of what the current administration is using this money for. Reading the statutory language in context, it's very clear that Congress, by referencing steel bollard designs, was referencing physical construction. We also discuss the plain meaning of the word construction, which is the operative word there. Construction implies a physical building. It doesn't imply remediation. It doesn't imply preparatory steps like a NEPA analysis, it implies a physical barrier. Judge Jones, you mentioned the Trump administration. The Trump administration at this time was building physical barriers. Congress passed these appropriations to fund that activity. That is fund physical barriers. I think all indicia of statutory interpretation in this case point towards the fact that the fiscal year 2020 and 2021 appropriations have to be used for physical barriers. In fact, on the systems point I just pointed out, the West Virginia case the Supreme Court recently pointed out, specifically says system, shorn of all context, the word is an empty vessel. The point is you have to look at that statutory context. It's a cardinal rule of statutory interpretation. Which really points up, I think, the entire merits analysis here. The federal government's position is that it can do everything that it wants with this money short of building physical barriers. That's not what the statutory language says. That's a reversal from what the Trump administration was doing, and it's an unexplained reversal. They talk a lot about speculation. They don't say how many of these systems, barrier systems, these cameras, these technologies that are going to secure the border. They don't say how many of those are going to install, and this is a relatively new development in this litigation. This analysis, this refusal to come to grips with what is the administration's policy, really relies on the same logic as Mr. Xi kind of posited here as the administration's COVID cases that went up to the Supreme Court. They're doing something that's going to help the states. This is their standing argument. This is their kind of discretionary argument. These barrier system attributes, however many they install, wherever they install them, are better than another extra mile of the border, which is not just an extra mile. In the 2020 press release, this is 1537, the Trump administration had a goal of 450 miles of new border wall system by December 31, 2020. The fund, according to the press release, the funds were for all 738 miles or 738 miles. That's a lot more than what this administration is doing. That's a lot more than just a minor extension. This is not about the Laredo sector, not just about the 70 miles. It's 70 times 10 miles. I mean, what is, how would you write an opinion that granted, assuming we cleared off, assuming these other jurisdictional hurdles were surmounted, how would you frame an opinion that granted a preliminary injunction finding, which we would have to find, that the plaintiffs are likely to succeed on the merits, and that would have to be based on facts and the law? I think the injunction would have to prevent the Department of Homeland Security. I'm not saying what the decree would be. I'm saying, how would you articulate that your position is likely to succeed on the merits? I think the statutory analysis is the strongest position, that the fiscal 2020 language, by mandating that the money go towards construction of physical barriers, does not permit the government to do everything but construct physical barriers, which has been their position throughout this entire litigation. And all the facts that would underlie that conclusion are undisputed. Is that your position? I think that, yes, Your Honor. That is a position the federal government has made no attempt to argue that. They've been very—I will say they've been coy about whether they will ever construct physical barriers. And this gets to the pretext argument. I think the way—the undisputed record, the actual evidence in the record, the presidential proclamation saying it's not a serious policy consideration to build walls, the course of conduct by the Department of Homeland Security saying in the first iteration of this plan that they're just going to engage in preparatory work that's going to take a long time, canceling the contracts, and it's in the record in the first plan that the money that these appropriations act to your point, Judge Jones, that money was going to go to paying the cost of those cancellations. And then the new amended plan, which expects—and I think expects is a severe understatement—expects to consume the entire amount of money, the entire appropriated amount on remediation and these barrier system attributes, however many they're going to pull together. That—those are the undisputed kind of facts in the record that show they're not constructing physical barriers and they have no intent to construct physical barriers. And then, you know, if we're going to redo the whole opinion, I think the other thing to point out on that front is they do not contest the other kind of key issue here, which is that the barrier does prevent illegal immigration. Their argument is, well, there's all these reasons why illegal migrants may come up and your point, Judge Jones, there sure are, and it's because this administration has done multiple policies that leave the border unsecured. We are allowed to sue over a single policy if it helps slow or reduce the rate of illegal migration. Their argument there doesn't actually contest that this would affect migration because their own department has argued that and made those statements. What they say instead is, well, there's some other policy we may have or there may be some other draws that lead this person to come to the country regardless. The wall would slow it down. That's in the record. That's undisputed. Okay.  Thank you. Thank you, Your Honors.